IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN M.,[1]

       Plaintiff,

v.

Commissioner of the Social Security
Administration,

       Defendant.
_____

Civ. No. 6:18-cv-00111-MC

OPINION AND ORDER

MCSHANE, Judge:

       Plaintiff brings this action for judicial review of the Commissioner's decision denying his application for disability insurance benefits ("DIB"). This court has jurisdiction under 42 U.S.C. §§ 405(g).

       Plaintiff alleged disability as of April 15, 2007. Tr. 21.[2] On October 27, 2016, Plaintiff appeared at a hearing before an Administrative Law Judge (ALJ) and presented testimony under oath. Tr. 49-97. On November 28, 2016, the ALJ determined Plaintiff was not disabled through December 31, 2012 (the date last insured), and was not disabled through July 4, 2016, but that Plaintiff was disabled as of July 5, 2016 (when he turned 55 years old). Tr. 43-44.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.
[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

1 – OPINION AND ORDER

Plaintiff argues the ALJ erred in rejecting his subjective complaints of symptoms and limitations and in rejecting certain opinions of treating and examining physicians. Because the Commissioner's decision is based on proper legal standards and supported by substantial evidence, the Commissioner's decision is AFFIRMED.

## STANDARD OF REVIEW

A reviewing court shall affirm the decision of the Commissioner of Social Security if her decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, the district court must review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's decision. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. *Id*. If the Commissioner fails to meet this burden, then the

claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

At step two, the ALJ found that Plaintiff had the following severe impairments: right shoulder impingement and acromioclavicular joint arthrosis status post arthroscopic repair; a long history of classic and common migraines; anxiety disorder not otherwise specified with traits of OCD; PTSD; panic disorder; agoraphobia; moderate single-episode major depressive disorder; and mild degenerative disc disease. Tr. 24-25. In formulating Plaintiff's RFC, the ALJ concluded that Plaintiff could perform light work with the following relevant limitations: he could stand/and or walk six hours; he could sit for six hours; he could occasionally reach overhead with his right hand; he must have access to bathroom facilities within five minutes of his work station; he could perform work limited to simple, routine tasks; and he could perform tasks requiring simple workplace judgment. Tr. 30. Based on the vocational expert's ("VE") testimony, the ALJ concluded Plaintiff could not perform past relevant work, but could perform the jobs of cleaner housekeeping, garment folder, and agriculture produce sorter. Tr. 41-42. As the Plaintiff could perform the above jobs, the ALJ determined Plaintiff was not disabled until reaching the "advanced age" of 55 years old, at which point Plaintiff was disabled because he could not perform past relevant work. Tr. 42-43.

Plaintiff argues the ALJ erred in finding his testimony as to the extent of his symptoms and limitations less-than fully credible. Plaintiff also argues the ALJ erred in rejecting certain opinions of treating and examining physicians. I disagree and turn first to the ALJ's determination that Plaintiff was not fully credible as to the extent of his limitations.

1. **The ALJ's Adverse Credibility Determination**

"Where, as here, Claimant has presented evidence of an underlying impairment and the government does not argue that there is evidence of malingering, we review the ALJ's rejection of her testimony for 'specific, clear and convincing reasons.'" *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012)). The ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989)). The ALJ "may consider a wide range of factors in assessing credibility." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). These factors can include "ordinary techniques of credibility evaluation," *id.*, as well as:

> (1) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (2) whether the claimant takes medication or undergoes other treatment for the symptoms; (3) whether the claimant fails to follow, without adequate explanation, a prescribed course of treatment; and (4) whether the alleged symptoms are consistent with the medical evidence.

*Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007). The ALJ in this case supported his credibility determination with references to several of the above factors.

The ALJ noted Plaintiff testified that he stopped working not because of his symptoms, but because his employer laid him off. Tr. 32. An ALJ may legitimately conclude a Plaintiff's limitations are not as severe as alleged when the Plaintiff admits his employment ended for reasons unrelated to his limitations and symptoms. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (concluding ALJ did not err in disregarding symptom testimony when evidence supported the determination that claimant "left his job because he was laid off, rather than

because he was injured[.]"). Here, Plaintiff alleged disability as of April 2007, the date he testified his employer laid him off.[3]

Additionally, the ALJ noted that "the evidence of record shows that his level of functioning was not as fully limiting as alleged[.]" Tr. 32. The ALJ pointed out that although Plaintiff alleged his vision presented difficulties in filling out forms, he failed to follow up with a referral to an ophthalmologist to rule out vision-caused headaches. Tr. 26. And although Plaintiff alleged hearing loss in his disability forms, a neurologist found Plaintiff's hearing "intact to soft whisper" and an examining physician found normal hearing bilaterally. Tr. 26. Although Plaintiff claimed to suffer from debilitating migraine headaches, he failed to follow through with medication for migraines and failed to follow up with his neurologist. These findings are supported by substantial evidence in the record.

At the October 2016 hearing, Plaintiff testified he suffers up to 15 migraines per month. Tr. 68. "Sometimes they last for 5 minutes; sometimes they last for three days, and I'll lose vision too. I'll lose a big chunk of my vision, where I can't see." Tr. 68. Although Plaintiff told his neurologist in January of 2010 that he suffered migraines for 20 years, Tr. 619, he waited nearly a year to present for a follow up appointment, Tr. 727. Plaintiff's neurologist noted "He was to have returned after a number of months, but failed to do so." Tr. 727. At that follow up, the neurologist stated Plaintiff's complaints of continuous headaches were inconsistent with the fact that he used headache medications "only several times per month." Tr. 628. When Plaintiff's neurologist retired in June 2011, she informed Plaintiff that one of her practice partners would treat Plaintiff if the prescribed medication proved ineffective. Tr. 638. Plaintiff next saw a

---

[3] As discussed below, each of the three specific and legitimate reasons supporting an adverse credibility decision discussed in *Bruton* are met here. Like Bruton, Plaintiff here also waited many months (i.e. over three years) after being laid off to seek treatment and, at least initially, failed to seek treatment despite complaints of severe pain. *Bruton*, 268 F.3d at 828.

5 – OPINION AND ORDER

neurologist nearly four years later, when he complained of frequent headaches with aura and a constant left frontal headache. Tr. 649. Four months later, Plaintiff's neurologist noted medication was effective and instructed Plaintiff to return in one month if need be. Tr. 653. Plaintiff never returned. The ALJ reasonably concluded that although Plaintiff alleges severe limitations from migraines, "the record reveals that he has not been fully compliant with treatment recommendations and that he has intermittent treatment with a neurologist." Tr. 32. An unexplained failure to follow a prescribed course of treatment is a valid reason supporting a finding that a Plaintiff is not fully credible as to the extent of his limitations. *Lingenfelter,* 504 F.3d at 1040.

The ALJ also noted inconsistencies between Plaintiff's statements about his limitations and the record. For example, at the hearing, Plaintiff stated he suffered a shoulder injury at work. Tr. 63. Plaintiff testified that after being laid off, he did not search for other work because "My shoulder was wrecked. I was trying to get surgery. . . . I couldn't move my arm. If I sneezed or coughed or anything, it would just fall dead . . . and it was always pins and needles in my [hand]." Tr. 64. Plaintiff testified he was "in bad shape" at his last job, and after being laid off, "I was laying in bed crying most of the time." Tr. 65. The ALJ noted that despite alleging debilitating shoulder pain since at least April 2007, "he did not seek orthopedic treatment until December 2009." Tr. 32. And although Plaintiff claimed never being released back to work following his August 2010 rotator cuff surgery, "the record reveals that he was released to work in early November 2010, three months after his surgery." Tr. 32. These inconsistencies support the ALJ's finding that Plaintiff was not fully credible as to his alleged limitations. *Bruton*, 268 F.3d at 828 (holding that leaving a job for reasons unrelated to one's alleged symptoms, waiting to seek treatment for nine months after employment ended, and failure to seek treatment despite

allegations of severe pain constitute specific and legitimate reasons for finding subjective complaints not entirely credible).

The ALJ did not err in utilizing "ordinary techniques of credibility evaluation" in weighing the validity of Plaintiff's self-reported limitations. *Ghanim*, 763 F.3d at 1163; *Lingenfelter*, 504 F.3d at 1040. Although Plaintiff argues another interpretation of the record is reasonable, that is not a legitimate reason for overturning the ALJ's conclusions. *See Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) ("If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996))). Because the ALJ provided "specific, clear and convincing reasons" for finding Plaintiff less-than credible regarding the extent of his limitations, the ALJ did not err in giving little weight to Plaintiff's testimony regarding those limitations. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Smolen v. Chater*, 80 F.3d 1273,1282 (9th Cir. 1996)).

2. **The ALJ's Weighing of the Medical Evidence**

Plaintiff argues the ALJ erred in rejecting certain opinions of Dr. Yeh, his primary care physician, and Drs. Hallenburg and Gomes, two examining psychologists. I disagree and address each argument in turn.

i) **Dr. Yeh**

Dr. Yeh began treating Plaintiff in December 2010, when Plaintiff established care for chronic headaches. Tr. 416. At the time, Plaintiff was attending mental health counseling and informed Dr. Yeh that his PTSD was improving with counseling. Tr. 416. One month later, Plaintiff complained of migraines and IBS. At the next visit, in June 2011, Plaintiff's primary complaint remained his constant headaches. "He said he has had a chronic headache all the time,

which is nonstop." Tr. 566. Plaintiff "seems to be managing [IBS] fine with the help of" medication. Tr. 568. Dr. Yeh ordered Plaintiff to continue following up with his neurologist for migraines. Tr. 568.[4]

Dr. Yeh next treated Plaintiff nine months later, in March 2012. Tr. 568. Plaintiff's chief complaint was neck pain following a car accident two days prior. Tr. 566. "Prior to [the car accident], his frequency of migraine headache has dropped down to once every 6 weeks. He believes all the medications and supplements he has been taking have helped. His bowel movements are fine." Tr. 569. Plaintiff's X-ray "revealed only mild degenerative change," and Dr. Yeh prescribed more stretching exercises. Tr. 569. Additionally, Dr. Yeh noted:

> He has been walking more due to working with the Occupy Eugene campaign and now he is doing some volunteer work at the office they established. He does volunteer work for Egan Warming Center during the winter. He does have some pain in the right heel after long walking. On the other hand, he has lost 23 pounds since the last visit due to healthier eating at the campus.

Tr. 569.

Three months later, Plaintiff presented with a primary complaint of pain in his right heel, hurting for over one year. Tr. 571. Plaintiff's reported walking 4-5 miles per day for his volunteer work. In fact, despite his heel pain, Plaintiff walked "a lot on a daily basis."[5] Tr. 571-72. Plaintiff's migraine "is still out of control." Tr. 571. Dr. Yeh instructed Plaintiff to establish care with another neurologist for his migraines.[6] Dr. Yeh treated Plaintiff a month later and,

---

[4] Plaintiff's neurologist, Dr. Wilkens, retired one week before Dr. Yeh ordered Plaintiff to continue following up with his neurologist. Despite Dr. Wilkens's comment that his practice partners would continue to treat Plaintiff for migraines, and despite Dr. Yeh's directive to continue following up with a neurologist, Plaintiff did not see another neurologist for over three years.
[5] The evidence of Plaintiff's daily walking, often for several miles at a time, is inconsistent with Plaintiff's testimony at the hearing that "standing on anything, other than padded carpet, is like walking on knives." Tr. 67. Plaintiff's testimony is also inconsistent with the fact that he saw a podiatrist on only one occasion, in July 2012. Tr. 483. The podiatrist discussed conservative management of stretching and heat/ice. Tr. 486. Although Plaintiff was invited to check back in 4-6 weeks, the record does not indicate Plaintiff ever followed up with the podiatrist.
[6] As noted, Plaintiff did not see a neurologist for another three years.

despite his chief complaint of pain in the heels of both feet, "He is still doing 'Occupy' work with plenty of walking." Tr. 572. Plaintiff's head and shoulder pain was stable.

Plaintiff's next visit was one year later, in August 2014, when he presented with foot pain and migraines. The doctor noted, once again, that Plaintiff would follow up with a neurologist. Two weeks later, Plaintiff saw Dr. Yeh again for a chronic pain follow up. Tr. 604. Dr. Yeh noted "He has been biking more and has lost some weight." Tr. 604. Plaintiff was encouraged "to try to remain as active as possible." Tr. 606.

In January 2015, Plaintiff presented with foot and right shoulder pain, and daily headaches. Tr. 643. Three months later, Dr. Yeh noted Plaintiff "continues to see benefit with use of the pain medicines with no significant side effects. Tr. 656. Plaintiff's headaches were better controlled with medication. Tr. 657.

Plaintiff's last visit with Dr. Yeh came in July 2015. Plaintiff's foot pain had improved and he had fewer headaches. Tr. 661. "He has been helping out at the camp site for homeless and involved in Occupy Eugene" as before. Tr. 661. As for Plaintiff's migraines, he had a good response to medication as needed. Tr. 662.

Over one year later, in October 2016, Dr. Yeh provided a medical evaluation form. Tr. 676. She diagnosed Plaintiff with chronic multiple pains, migraine with aura, and cubital tunnel syndrome of the right arm. Chronic pain was the one diagnosis expected to last at least one year. Plaintiff's symptoms included intractable pain, impaired walking distance, and sleep disturbance. As relevant here, Dr. Yeh opined Plaintiff would need to lie down or rest "for at least an hour due to the pain" and Plaintiff's impairments would result in more than four days of missed work each month. Tr. 678-79.

The ALJ is responsible for resolving conflicts in the medical record, including conflicts among physicians' opinions. *Carmickle v. Comm'r*, 533 F.3d 1155, 1164 (9th Cir. 2008). Generally, a treating doctor's opinion is entitled to more weight than an examining doctor's opinion, which in turn is entitled to more weight than a reviewing doctor's opinion. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). When a treating physician's opinion is contradicted by another medical opinion, the ALJ may reject the treating physician's opinion only by providing "specific and legitimate reasons supported by substantial evidence in the record." *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

The ALJ gave little weight to Dr. Yeh's opinion that Plaintiff had to lie down or rest at least one hour every day and that Plaintiff would miss at least four days of work each month.[7] Tr. 40. The ALJ concluded those portions of Dr. Yeh's opinion were inconsistent with the longitudinal medical record, other medical opinions, and inconsistent with Dr. Yeh's own treatment notes. Tr. 40. The ALJ noted "at no time did the claimant report that he must lie down periodically during the day nor does the evidence show the claimant was unable to make appointments with Dr. Yeh." Tr. 40. In fact, the first mention in the record regarding a need to lie down comes in Dr. Yeh's medical evaluation form. A "discrepancy" between a doctor's examination notes and his medical opinion "is a clear and convincing reason for not relying on the doctor's opinion." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

The ALJ noted that although Plaintiff complained in June 2011 of "a chronic headache all the time, which is nonstop," Tr. Tr. 566, he failed to follow up when Dr. Yeh referred him to a neurologist. Tr. 40. During that visit, Dr. Yeh, noted medication "seems to be managing" Plaintiff's IBS. Tr. 568. Although Dr. Yeh ordered Plaintiff to follow up in a few months, Plaintiff did not return until nine months later, complaining of neck pain from a car crash. Tr.

---

[7] Dr. Yeh was the only physician to suggest these limitations.

10 – OPINION AND ORDER

569. During that visit, and in fact during every visit for the next few years, Dr. Yeh reported Plaintiff walked 4-5 miles per day, Tr. 571, was "still doing 'Occupy' work with plenty of walking," Tr. 572, and Plaintiff's biking to lose weight. Tr. 606. The ALJ reasonably concluded Dr. Yeh's opinion that Plaintiff lie down at least an hour every day was inconsistent with his September 2014 treatment note where Dr. Yeh encouraged Plaintiff "to try to remain as active as possible." Tr. 606. Indeed, at the last visit before Dr. Yeh filled out the evaluation, occurring over one year before Dr. Yeh provided his opinion, Dr. Yeh noted Plaintiff had less foot pain, fewer migraines (which were responding well to medications), and that Plaintiff continued to help out at the homeless camp and Occupy Eugene. Tr. 661-62.

The ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for giving little weight to Dr. Yeh's opinion that Plaintiff lie down or rest one hour each day and would miss at least four days of work each month. Although Plaintiff argues another interpretation of the record is reasonable, that is not a legitimate reason for overturning the ALJ's conclusions. *See Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) ("If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996))).

    ii) **The Opinions of Drs. Hallenburg and Gomes**

Plaintiff argues the ALJ erred in rejecting portions of the opinions of two examining psychiatrists, Dr. Hallenburg and Dr. Gomes. On May 25, 2011, Dr. Hallenburg performed a 45-minute pyschodiagnostic interview of Plaintiff. Tr. 424. Plaintiff stated he could not work due to panic attacks, and because "He stated he is hypervigilant and therefore does not sleep." Plaintiff reported PTSD, nightmares, memory problems, and paranoia. Tr. 424. Plaintiff reported "a

general depression" and stated he "is easily upset, withdraws from people, feels hopeless, worthless, has low self-esteem, and a loss of interest in activities." Tr. 424. Plaintiff reported anxiety from IBS, as "he has to know where the bathrooms are and that they are in the safe area. He spends hours in the bathroom." Tr. 425. IBS "is a major problem for him." Tr. 425. "He said he gets a migraine every day all day and gets them with an aura of about two or three times a week. He feels it is getting worse." Tr. 425. Dr. Hallenburg noted:

> His last job was Monaco Coach between 2002 and 2007 in production. He sated he was fired because the man next to him wanted to fight because the claimant was having a problem with the way he was doing his job. The claimant was also having difficulty keeping that job because of his irritable bowel syndrome problems and had to leave often to use the restroom. He has looked for jobs since 2007 but has not been successful.

Tr. 426.

Dr. Hallenburg wrote, "He is anxsious about going out of his house at any time and does not go out unless he has to." Tr. 427. Dr. Hallenburg concluded Plaintiff:

> presented with a mix of anxiety symptoms and depression. He has quite a few symptoms of obsessive-compulsive disorder but it has not interfered with work in the past. His level of functioning has significantly declined in the last five years. His level of depression and anxiety may be possible contributors to his physical ailments, which are severely restricting him. Mental health symptoms would most likely respond to a better medication regime.

Tr. 429.

Dr. Hallenburg believed Plaintiff was capable of learning detailed and simple tasks, but that "It is likely that his anxiety would significantly interfere with working at this point, especially if he is not being able to sleep." Tr. 429. The ALJ accepted Dr. Hallenburg's opinion that Plaintiff was capable of learning simple tasks, but rejected other parts of the opinion. Tr. 35. The ALJ determined Dr. Hallenburg's remaining opinions were inconsistent with other evidence in the record, and that Dr. Hallenburg "appears to rely heavily on the claimant's subjective

complaints that are not supported by the longitudinal record, including the claimant's own testimony." Tr. 429. These conclusions are supported by substantial evidence in the record.

The ALJ reasonably concluded that Dr. Hallenburg relied heavily on Plaintiff's subjective complaints. Dr. Hallenburg concluded Plaintiff's "physical ailments . . . are severely restricting him" and his "mental health symptoms would most likely respond to a better medication regime." Tr. 429. Dr. Hallenburg also noted Plaintiff's IBS "is a major problem for him." Tr. 425. However, six days after Dr. Hallenburg's examination of Plaintiff, Dr. Yeh reported Plaintiff "seems to be managing [IBS] fine with the help of" medication. Tr. 568. As noted, Plaintiff did not see Dr. Yeh again for nine months, after hurting his neck in a car accident. Tr. 569. And although Dr. Hallenburg noted Plaintiff "said he gets a migraine every day all day," Plaintiff failed to follow up with Dr. Yeh's directive six days later to follow up with a neurologist for his migraines. Although Plaintiff told Dr. Hallenburg he was fired from Monaco for fighting, Plaintiff told the ALJ he was simply laid off. Although Dr. Hallenburg reported Plaintiff has "looked for jobs since 2007," Tr. 426, Plaintiff testified he did not look for other work after being laid off because his shoulder "was wrecked," he could not move his arm, and he was trying to get surgery, Tr. 64. Although Dr. Hallenburg noted Plaintiff's depression resulted in a significant decrease in functioning over the past five years, Tr. 429, Plaintiff told Dr. Yeh six months earlier that his PTSD was getting better with counseling and he denied other mental health issues, Tr. 418. The ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for assigning Dr. Hallenburg's opinion little weight.

On May 8, 2014, Dr. Gomes performed a psychiatric examination of Plaintiff. Tr. 586. Dr. Gomes noted that although Plaintiff received mental health therapy in 2011, "he stopped going to therapy in 2012, when the Center's office closed. He did report that the therapy for

PTSD was very helpful." Tr. 587. Plaintiff told Dr. Gomes he was fired from Monaco "because a coworker started to have a fight with him in addition to his frequent IBS bathroom breaks. He states that he thought he was set up and fired because he was coming up on his fifth year of tenure." Tr. 588. Plaintiff stated "he has never been medically released to return to work." Tr. 588. Plaintiff reported short and long term memory difficulties. Plaintiff reported not walking much, and having few recreational activities or hobbies. Tr. 589. Dr. Gomes noted Plaintiff "acknowledges having significant concentration and focusing difficulty. . . . He reports having both short-term and long-term difficulty." Tr. 589. "He endorsed significant problems with getting around physically, household life activities, participation in society, and his ability to understand and communicate." Tr. 591. Plaintiff was "Barely able to walk into here today" because of the pain. Tr. 591. Dr. Gomes opined that Plaintiff:

> has some significant impairment noted by his ability to focus and concentrate on detailed and complex tasks because he reports that it gives him headaches or potentially a migraine. He also complains he has many other physical and medical problems. . . . He has low moderate impairment noted with his ability to interact with others because of his preoccupation with his own anxiety and hypervigilance in addition to his preoccupation with pain. . . . He has moderate severity in his ability to hold a schedule because of his poor sleep quality. . . . Severe impairment in his ability to manage usual workplace stressors. He states that even attending this interview was overwhelming. [H]e is generally in a high state of anxiety with low release, especially if outside the comfort and safety of his home.

Tr. 592.

The ALJ noted that although the record supports Dr. Gomes's opinion regarding "some impairment in maintaining focus and concentration for detailed tasks," the remaining opinions were not consistent with the record. Tr. 35. Additionally, according to the ALJ, Dr. Gomes's opinions relied heavily on Plaintiff's subjective reporting of his limitations. These findings are supported by substantial evidence in the record.

The ALJ noted that although Plaintiff presented to Dr. Gomes in a confused manner, requiring the assistance of his spouse to fill out paperwork, Plaintiff appeared alone to an examination two weeks later, presented no symptoms of hypervigilance, and scored 29-30 on a mini-mental status exam. Tr. 35. Although Plaintiff told Dr. Gomes he did not walk much, Dr. Yeh noted Plaintiff walked 4-5 miles per day for his volunteer work. Tr. 571. Although Plaintiff told Dr. Gomes he was not active with hobbies or recreational activities, the ALJ noted Plaintiff was heavily involved in volunteer activities. Tr. 35. Although Plaintiff told Dr. Gomes he could barely make it through the examination due to pain, the ALJ determined, as outlined above, that Plaintiff's subjective reports of his symptoms were less-than fully credible.

Although Plaintiff told Dr. Gomes he stopped receiving mental health therapy when the clinic closed, the ALJ pointed to notes from the clinic demonstrating Plaintiff simply stopped attending therapy sessions. Tr. 33. Plaintiff's mental health notes indicated Plaintiff's PTSD improved with therapy, and Plaintiff stated "I can go in big crowds and address people [in volunteer work]." Tr. 467. Plaintiff was proud of his volunteer work, as he appreciated feeling productive and needed. Tr. 411. Despite demonstrating "commitment and follow-through relating to attendance and coping strategies," Tr. 467, Plaintiff at some point stopped attending appointments and did not respond to calls from the clinic, Tr. 464.

Rather than fully credit Dr. Gomes's opinion, the ALJ instead gave great weight to the opinions of Dr. Belcher, who performed a psychological examination of Plaintiff two years after Dr. Gomes's examination. Tr. 36. The ALJ determined Dr. Belcher's opinion was more consistent with the record-as-a-whole. As noted by Dr. Belcher, "He reported being very involved in Country Fair activities and said he is politically and socially active in the community. He and his wife garden, ride bicycles, and have family activities. He reported participating in a

recent large family reunion. He spends a lot of time reading." Tr. 609. Although Plaintiff told Dr. Belcher he had social anxiety, the only symptom Plaintiff provided was avoiding the mall. Tr. 610. Notably, Dr. Belcher observed:

> He said, because of the security work he did in the past and having to be in "high alert status," he watches people carefully and "looks for danger" when he is in crowds. He reported other aspects of hypervigilance that included always sitting with his back to the wall and "constantly looking around." During this evaluation, he sat for a brief time while completing the informed consent forms with his back to the door, and he rarely looked around the office. Instead, he tended to stare at the floor.

Tr. 610.

Dr. Belcher noted that "Although this client reports being extremely hypervigilant, he did not exhibit any such behavior at this evaluation." Tr. 611. "He reports having social anxiety, but his description of it is the hypervigilance he professes. he reports no other symptoms of anxiety." Dr. Belcher's notes of Plaintiff's extensive volunteer activities conflict with Dr. Gomes's opinion that Plaintiff "is generally in a high state of anxiety with low release, especially if outside the comfort and safety of his home." Tr. 591. Where there exists conflicting medical evidence, the ALJ is charged with determining credibility and resolving any conflicts. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). Here, the ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for assigning greater weight to Dr. Belcher's opinion than to that of Dr. Gomes or Dr. Hallenburg.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

## CONCLUSION

The ALJ's decision is free of legal error and supported by substantial evidence. The Commissioner's final decision is therefore AFFIRMED.

IT IS SO ORDERED.

DATED this 18th day of September, 2019.

       /s/ Michael J. McShane       
Michael McShane
United States District Judge